# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHANNON BLUE, on behalf of herself )
and all other plaintiffs similarly situated )
known and unknown )
                                                 )
             **Plaintiffs,** )
                                                   )    **Case No. 03 C 6692**
                       **v.** )    **Magistrate Judge Nan R. Nolan**
                                                   )
**THE CHUBB GROUP,** )
                                                   )
             **Defendant.** )

## MEMORANDUM OPINION AND ORDER

Plaintiff Shannon Blue, on behalf of herself and all other employees similarly situated, sued her former employer, The Chubb Group, Inc., for overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.* Chubb moves for summary judgment arguing that Blue was properly classified as exempt under the FLSA and the IMWL. Chubb additionally argues that it is entitled to summary judgment on Blue's IWPCA claim because the undisputed facts show that she did not have an agreement with anyone at Chubb to receive any additional compensation. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Defendant's Motion for Summary Judgment is granted in part and denied in part as to Counts I and II and granted as to Count III.[1]

---

[1] The Court may grant summary judgment on less than a whole claim. <u>Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.</u>, 313 F.3d 385, 391 (7th Cir. 2002).

## FACTS

The following facts are taken from the parties' Local Rule 56.1 statements of facts and accompanying exhibits and are undisputed unless otherwise noted.

### A.     The Parties

Chubb writes and sells personal and commercial insurance policies, including workers' compensation policies. Pl's Resp. to Def's 56.1 Stmt. ¶ 8. Chubb's Workers' Compensation Claims Department is divided into two subgroups: Medical Only, which handle claims where the employee was not absent from work, and Lost Time, which handle the remaining, more complex cases. Id. ¶ 14. Chubb classifies its Lost Time Adjusters ("LTAs") as exempt and pays them on a salary basis. Id. ¶ 15. Medical Only adjusters are classified as non-exempt by Chubb. Id.

Blue worked for Chubb in California from 1989 to 1993, first as a premium audit trainee and then as a workers' compensation claims representative. Pl's Resp. to Def's 56.1 Stmt. ¶ 20. On October 30, 2000, Blue began working in Chubb's Chicago office as an LTA. Id. ¶ 16. From the time Blue was hired until about September 2001, Carol Smurawski was Blue's direct supervisor. Id. ¶ 18. In or about September 2001, Lakasha Shannon succeeded Smurawski as Blue's direct supervisor. When Blue started working at Chubb in Chicago, she earned a salary of $1917.17 twice a month. Id. ¶ 22. At the time of her termination, Blue's salary was $2054.39 twice a month. Id.

Blue testified that she did not have any agreement with anyone at Chubb that she would be paid overtime if she worked overtime hours. Pl's Resp. to Def's 56.1 Stmt. ¶ 23.[2] While working

---

[2] Blue denies Chubb's factual assertion but fails to cite evidence in the record supporting her denial. Chubb's factual assertion is deemed admitted. See L.R. 56.1(b); McGuire v. United Parcel Service, 152 F.3d 673, 675 (7th Cir.1998) (stating "[a]n answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").

at Chubb, Blue had a bank of paid time off ("PTO") days that she could use. Id. ¶ 24. Blue never

had any deductions from her salary as a result of an absence from work. Id. ¶ 25.

### B.    Blue's Duties As a Lost Time Adjuster

#### 1.    Blue's Caseload

Workers' compensation claims in which the claimant lost time from work were assigned to

Blue in the first instance. Pl's Resp. to Def's 56.1 Stmt. ¶ 27. Chubb expected Blue to handle 150-

165 cases at any given time. Id. ¶ 28. Blue estimated that the cases she handled were valued at

between $4,000,000 and $4,500,000 in the aggregate. Id. ¶ 29. Blue investigated over 200 claims

when she worked at Chubb in Chicago. Id. ¶ 35.

#### 2.    Blue's Investigation of Her Assigned Claims

One of the essential functions of an LTA is to investigate assigned claims. Pl's Dep. at 83-

84.[3] Blue testified that every claim is different. Pl's Resp. to Def's 56. 1Stmt. ¶ 31. Blue further

testified that every injury is different "because every individual is different." Id. ¶ 32. During her

investigation of claims, Blue determined compensability, cause of the injury, and the extent of the

injury. Id. ¶ 37. She did a minimal investigation of whether there was coverage. Id. She also

looked for subrogation and fraud issues during her investigations. Id.

When investigating a worker's compensation claim, Blue determined the "date of loss, if the

claim fell within the policy period, the facts of the injury, employment of the claimant, their work

scenario, their medical information and history, [and] if they had any underlying medical problems

that would relate to the work injury." Id. ¶ 36. Blue testified that she had to identify all issues

---

[3] Blue testified at her deposition that her investigations of assigned claims was performed in
conjunction with direction given by her supervisor. Pl's Dep. at 83-84.

relevant to the claims she handled. Id. ¶ 38. Although Chubb provided its LTAs with templates of questions to ask during an investigation, Blue was still expected to identify any follow-up areas. Id. ¶ 39. Blue knew how to ask follow-up questions on her own without going back to her supervisor to ask for a list of additional questions. Id. ¶ 40. Blue admitted that she sometimes had to give thought to the types of questions she asked in the course of an investigation. Id. ¶ 41.

Blue believed that as an LTA, she conducted accurate, detailed investigations that led to accurate and timely decisions on claims. Pl's Resp. to Def's 56.1 Stmt. ¶ 43; Pl's Dep. at 76, 224.[4] At her deposition, Blue could only recall one instance when Shannon reinvestigated one of Blue's assigned claims by contacting the insured and asking questions. Pl's Resp. to Def's 56.1 Stmt. ¶ 44. On other occasions, Shannon directed Blue to "go back and make this phone call and ask these questions." Id. ¶ 45. In September 2001, Smurawski presented Blue with a competency assessment that stated, "Blue possesses strong investigative skills. She dedicates a great amount of time investigating a claim." Id. ¶ 47. Blue testified that she agreed with this assessment by Smurawski. Id.

### 3.    Blue's Responsibility for Deciding Compensability For Her Assigned Claims

Whether a claim is compensable in the workers' compensation context depends on whether the claim has merit and, according to the jurisdiction, whether benefits are payable. Pl's Resp. to Def's 56.1 Stmt. ¶ 48. As an LTA, Blue made recommendations on whether a claim was compensable. Id. ¶ 49. Compensability decisions had financial consequence to Chubb and were decisions of financial importance to Chubb. Id. ¶ 50. If a compensability decision is decided

---

[4] Blue denies Chubb's factual assertion. Blue relies on page 225 of her deposition but that portion of her deposition does not dispute the accuracy of Chubb's factual assertion. Chubb's factual assertion is deemed admitted.

improperly, it has the potential for creating liability for Chubb. Id. Compensability decisions vary by jurisdiction, and at times, Blue had to determine which jurisdiction a claim fell within. Id. ¶¶ 53, 54. To determine which state had jurisdiction over the claim, Blue considered, among other things, the law where the accident happened. Id. ¶ 54.

On or about August 28, 2002, Blue wrote, "Based on my investigation, I am able to determine compensability, send payments timely, deny or dispute claims or specific issues." Pl's Resp. to Def's 56. 1Stmt. ¶ 51.[5] On or about that same date, Blue also wrote, "I do believe that when I have received all of the information to determine whether benefits are due, I pay or deny those claims." Id. ¶ 52. Blue asserts that she shared responsibility with her supervisor for determining whether an injury was work-related, which relates to compensability. Id. ¶ 55. To determine whether an injury was work-related, Blue had to identify whether the injury arose out of or occurred in the course of the claimant's employment. Id.

### 4. Blue's Responsibility for Deciding Coverage for Her Assigned Claims

Whether a claim is "covered" means whether the insurance policy covers the claim. Pl's Resp. to Def's 56.1 Stmt. ¶ 56. Blue decided whether or not any of her assigned claims was covered by the applicable policy. Id. ¶ 57. To determine whether a claim was covered, Blue had to determine whether an employment relationship existed between the claimant and the insured. Id. ¶ 58. Coverage decisions had financial consequences for Chubb. Id. ¶ 59. If a coverage decision is decided improperly, it has the potential for creating liability for Chubb. Id. As an LTA, Blue

---

[5] In response to her 2002 performance review, Blue prepared an e-mail dated August 28, 2002 and attached a document to address some of the issues Shannon had raised. Pl's Resp. to Def's 56.1 Stmt. ¶ 157. At the time she wrote the e-mail, Blue believed everything she wrote therein was true. Id.; Pl's Dep. at 219.

made recommendations to her supervisor to deny coverage. Id. ¶ 61. When Blue made a recommendation that a claim was not covered, she was required to provide an explanation for her recommendation. Id. ¶ 62. Smurawski and Shannon accepted Blue's recommendation to deny coverage about half the time. Id. ¶ 63.[6]

### 5.  Blue's Responsibility for Identifying Fraud In Her Assigned Claims

Blue admits that as an LTA, she had responsibility for identifying fraud or potential fraud on her assigned claims but asserts that she shared this responsibility with Shannon. Pl's Resp. to Def's 56.1 Stmt. ¶ 64. Blue understood that the more detailed an investigation, the more likely she would be able to uncover fraud. Id. ¶ 65. Blue also understood that the earlier she could identify potential fraud, the more likely it was to be uncovered. Id. ¶ 66.

### 6.  Blue's Responsibility for Completing an Action Plan

After investigating a claim, Blue completed an action plan on every claim assigned to her. Pl's Resp. to Def's 56.1 Stmt. ¶ 67; Pl's Dep. at 92. Action Plans included the claimant's name, the date of loss, detail about the injury, whether the claimant was represented by counsel, and the reserve amount for the claim. Pl's Resp. to Def's 56.1 Stmt. ¶ 68. Blue was also responsible for including her recommended course of action on how to handle the claim in the action plan. Id. ¶ 69. Blue would fill in what her recommendation was "to do first, second, third, fourth, and fifth." Pl's Dep. at 94. Blue asserts that she shared the responsibility of determining a course of action in action plans with Shannon. Pl's Resp. to Def.'s 56. 1Stmt. ¶ 69.

---

[6] Blue denies Chubb's assertion that Shannon accepted her recommendation to deny coverage about half the time. In support of this denial, Blue cites to paragraph 33 of her affidavit fails to support Blue's denial. Blue's citation to the record does not support her denial. Therefore, Chubb's factual assertion is deemed admitted.

**7.    Blue's Responsibility for Disability Management for Her Assigned Claims**

As an LTA, Blue was responsible for disability management, which meant trying to get a claimant back to work as soon as possible, if possible. Pl's Resp. to Def's 56.1 Stmt. ¶ 70. To get the claimant back to work as soon as possible, Blue worked with the insured to come up with solutions. Id. Blue states that she shared this responsibility with Shannon. Id. Occasionally, Blue worked with in-house nurses to determine whether the solutions were medically feasible. Id. ¶ 72. In connection with determining whether or not an employee was capable of returning to work, Blue would recommend whether to use vocational rehabilitation services. Id. ¶ 73. Blue's recommendations for vocational rehabilitation were followed for her Wisconsin claims but the majority of her recommendations regarding her Illinois and Indiana claims were rejected. Id; Pl's Dep. at 131-32.

**8.    Blue's Responsibility for Medical Case Management for Her Assigned Claims**

Blue generally agrees that medical case management is a necessary component for effective claims management. Pl's Resp. to Def's 56.1 Stmt. ¶ 74. Blue represented, "I worked very closely with the medical component of the file to get medical [information] that forecast the outcome of the file so I can get as accurate a reserve as possible within the first calendar year in the life of the file." Id. ¶ 75. Blue explained how she attempted to coordinate strategy with nurse resource input: "After they provided me with the information they had, depending on what claim information I needed, I will either say can you find this information out or I would have to write a letter for myself to the doctor getting information I needed for the claim." Id. ¶ 76.

Blue admits that as a LTA, she recognized and identified critical medical case management issues when she saw them, including the causes of various disabilities. Pl's Resp. to Def's 56.1

-7-

Stmt. ¶ 77. Blue adds that nurses supplied most of the information about the injury including the projected length of the disability. Id. In order to recognize critical medical case management issues, Blue had to have some working knowledge of medical issues. Id. ¶ 78. Blue was expected to find out the causes of various disabilities or medical conditions. Id. ¶ 79. Blue adds that Shannon often directed her on how to do this. Id.

As an LTA, Blue needed to know how and when to use the independent medical evaluation ("IME") process. Pl's Resp. to Def.'s 56.1 Stmt. ¶ 80. Blue explained that the timing of the IME could be crucial because "[i]f you requested the IME at the wrong time, the information was either obsolete or could have been skewed." Id. ¶ 81. Every claim did not require an IME. Id. ¶ 83. More often than not, Shannon reviewed the files and instructed Blue to get an IME or to hold of on an IME. Blue's Dep. at 118-19. The remainder of the time, Blue made the decision on whether or not to have an IME done. Id. Blue received a copy of the IME's report. Pl's Resp. to Def's 56.1 Stmt. ¶ 85. Blue reviewed the IME's report or the notes from the nurse case manager's review of the IME report and determined whether to recommend a modification of the action plan for that claim. Pl's Dep. at 121-22. Blue asserts that she and Shannon shared responsibility for reviewing medical bills to ensure that they were for her claimant, from the treating physician listed in the file, and for the same general body part. Pl's Resp. to Def's 56.1 Stmt. ¶ 87.

**9.    Blue's Responsibility for Setting a Reserve Amount for Her Assigned Claims**

Chubb expected reserves to be set within the first 90 days of a claim. Pl's Resp. to Def's 56.1 Stmt. ¶ 88. At Chubb in Chicago, LTAs were not permitted to stair-step reserves. Stair-stepping reserves occurs when an LTA sets the reserve based on the information she has at the time and then increases the reserve when new information on the claim becomes available. Id. ¶ 90. Blue

-8-

understood that Chubb's reserve policy required her to set a reserve within 90 days of a claim and to set the reserve for the life of the file, not just for the settlement value. Id. ¶ 89. Blue testified that reserves were to be set "when you had enough information and you felt comfortable, at th[at] point you should make your recommendation." Id. ¶ 91. Blue further testified that the reserve amount is based on the results of her investigation, review of medical evaluations, and review of disability management evaluations. Id. ¶ 92. Blue considered several factors in setting a reserve amount, including the type of illness, the age of the claimant, the claimant's prior medical history, prior workers' compensation history, prior work history, and the type of job the claimant was working when he or she was injured. Id. ¶ 93. Blue considered the following additional factors in setting a reserve: the details of the claim accident, notes she had received from her supervisor and direction from her supervisor, Best Practices and past claims that had similar circumstances and what they cost, and the Q-dex, which is a collection of cases which have been tried before the Illinois Industrial Commission. Id. ¶ 98.[7] Blue also used medical reports, medical opinions, and medical definitions to come up with as accurate a reserve as possible. Id. ¶ 99.

As an LTA, Blue recommended a reserve number to her supervisor. Pl's Resp. to Def's 56.1 Stmt. ¶ 95. Chubb expected Blue to thoroughly outline her rationale or basis for a reserve recommendation. Id. ¶ 94. Smurawski accepted Blue's reserve number recommendations about 50% of the time and Shannon accepted Blue's reserve number recommendations less than 50% of the time. Id. ¶ 96. When Blue's supervisor rejected her reserve number recommendation on a claim, the supervisor would either provide Blue with an alternative number or would ask Blue to

---

[7] Chubb designed Best Practices to improve the processing of workers' compensation claims. Def's Resp. to Pl's 56.1 Stmt. ¶ 2. Best Practices implemented specific procedures and standards for processing workers' compensation claims. Id.

reinvestigate the file and recommend another number. Id. ¶ 97.

### 10.    Blue Participated In Round Table and Committee Discussions

Round tables are meetings of LTAs and their supervisor to discuss claims. Pl's Resp. to Def's 56.1 Stmt. ¶ 100. Sometimes nurses and technical assistants participate in round tables. Id. Blue presented claims to the round table. Id. ¶ 101. Chubb also uses committees to discuss claims that have a reserve value over $100,000. Id. ¶ 102. Committee meetings are attended by LTAs, nurses, supervisors, and Ruth Nelson. Id. ¶ 103.[8] Blue testified that the purpose of the committee meetings was "to present your case and to get feedback from the committee and for essentially a vote to determine what the number should be for the reserve." Id. ¶ 104; Pl's Dep. at 135. Blue presented one case to the committee. Pl's Resp. to Def's 56.1 Stmt. ¶ 105. Before presenting her case to the committee, Blue had to decide a reserve number to recommend. Id. ¶ 106. Blue points out that she shared responsibility for deciding a recommended reserve number with her supervisor. Id. ¶ 106. Blue was expected to be prepared to respond to any questions that the committee members might have about her claim. Id. ¶ 108. In preparation for the committee meeting where Blue presented her case, Smurawski asked Blue questions she might be asked at the meeting. Pl's Dep. at 137. Blue also sat on the committee when other LTAs presented their cases to the committee. Pl's Resp. to Def's 56.1 Stmt. ¶ 109. When Blue was on the committee, she would ask questions of the LTA. Id. ¶ 110. Blue recalls committee discussions regarding settlement and reserve strategies. Id. ¶ 111.

### 11.    Blue Negotiated Settlements Of Her Assigned Claims

Blue admits that she was expected to negotiate settlements of her assigned claims but asserts that she shared this responsibility with Shannon. Pl's Resp. to Def's 56.1 Stmt. ¶ 113. Blue was

---

[8] Ruth Nelson was the manager of Chubb's Workers' Compensation Claims Department.

expected to make the first offer of settlement. Id. ¶ 112.[9] The majority of time, Blue successfully negotiated settlements on her claims without the assistance of defense counsel. Id. ¶ 114. On more than ten occasions, Blue recommended to her supervisor that defense counsel take over negotiation of a claim. Id. ¶ 115; Pl's Dep. at 40-41. Blue recommended defense counsel take over negotiation of a claim in two circumstances: (1) if a case was set for a pretrial conference at the Industrial Commission and defense counsel saw an opportunity to resolve the claim and (2) if Blue had a poor working relationship with petitioner's counsel. Pl's Resp. to Def's 56.1 Stmt. ¶ 115. Blue admits that when defense counsel was assigned to a claim, she maintained responsibility for giving instructions to counsel on how to manage the file but adds that she shared this responsibility with Shannon. Id. ¶ 116; Pl's Dep. at 41. Blue testified that settlement negotiations required critical thinking skills because "you should be able to say these are the facts of my case, this is what my case is worth and this is what I'm going to offer, this is where I'm going to end." Pl's Resp. to Def's 56.1 Stmt. ¶ 117. Blue asserts that she and Shannon shared responsibility for conducting negotiations with either the petitioner or the petitioner's attorney. Id. ¶ 118.

Blue used specific techniques when she negotiated settlements, including listening "a lot" and trying to learn what was motivating the other side. Pl's Resp. to Def's 56. 1Stmt. ¶ 119. Blue considered herself a good negotiator. Id. ¶ 120. Blue attended two settlement negotiation training seminars at Chubb, but Blue did not find them helpful because they covered things she already knew. Id. ¶ 121. Although Blue had to seek approval for settlement authority, she did not have to go back

---

[9] Blue denies Chubb's factual assertion and cites to paragraph 11 of her affidavit. Paragraph 11 of her affidavit does not specifically dispute Chubb's assertion. Chubb's factual assertion is deemed admitted.

and obtain permission to settle a claim for any number that was within that authority. Id. ¶ 122.[10] Even if Shannon did not accept Blue's settlement recommendation, Shannon did not take over the negotiations. Pl's Resp. to Def's 56.1 Stmt. ¶ 123.[11]

### 12. Blue's Responsibility for Litigation Management Of Her Assigned Claims

Blue testified that she sometimes recommended to her supervisor that a claim should be assigned to outside counsel. Pl's Resp. to Def's 56.1 Stmt. ¶ 124. In other instances, Blue's supervisor instructed her to refer a claim to defense counsel. Id. ¶ 125. Blue asserts that when a case was assigned to outside counsel, she and Shannon shared responsibility for litigation management of the claim. Id. ¶ 126. Blue further asserts that she and Shannon conducted ongoing discussions with defense counsel to develop litigation strategy. Id. ¶ 127. Blue was the point of contact for defense counsel. Id. ¶ 128. Defense counsel would provide Blue with regular updates or case analysis, which Blue would read and include in the claim file. Id. ¶ 129. Blue asserts that depending on what defense counsel said, she and Shannon would decide which actions to take. Id. Although she could not recall any specific instances at her deposition, Blue testified that she is "sure" that there were instances when she disagreed with outside counsel's case analysis. Pl's Dep. at 50. In

---

[10] Blue denies Chubb's factual assertion as it relates to Shannon's supervision but Blue fails to cite any evidence in the record supporting her denial. Pl's Resp. to Def's 56.1 Stmt. ¶ 122. Chubb's factual assertion is deemed admitted. Moreover, at page 209 of her deposition, Blue testified as follows:

> Q      Now, under Lakasha Shannon, would you have to go back and obtain additional permission to settle a case if it was within the initial settlement authority?
>
> A      No.

[11] Blue's denial of Chubb's factual assertion is unsupported by citation to evidence in the record. See Pl's Resp. to Def's 56.1 Stmt. ¶ 123. Chubb's factual assertion is deemed admitted.

approximately 60% of the times when Blue disagreed with defense counsel, Blue would make a recommendation to Shannon on how to proceed in light of the case analysis. Id. at 60-61. Blue asserts that she and Shannon shared responsibility for assisting defense counsel in preparing for trial in regard to trial-ready claims. Pl's Resp. to Def's 56.1 Stmt. ¶ 131. Their assistance included giving defense counsel instruction of whether to try the case or to submit it for pretrial. Id. Before getting a claim trial-ready, Blue was required to review the case with her supervisor and recommend to her supervisor whether or not the case should be tried. Id. ¶ 132. Blue explained, "Though I have not been able to try any denied claim in Illinois, I have been well prepared for cases as they have approached the Arbitrator." Id. ¶133.

**13.    Blue's Responsibility for Communicating With Outside Counsel on Other Issues**

Blue understood that as part of her job duties as an LTA, she could seek advice of outside counsel when she though it was appropriate. Pl's Resp. to Def's Stmt. ¶ 135. Blue also understood that in some instances she could seek the advice of outside counsel without obtaining prior approval of her supervisor. Id. ¶ 136. Blue estimates that she sent letters to outside counsel seeking legal opinions without receiving instruction from her supervisor about 10% of the time. Id. ¶ 137. Blue also made recommendations to her supervisor to seek legal opinion from outside counsel. Id. ¶ 138. Blue would recommend seeking the advice of outside counsel if she did not know a legal rule in a particular jurisdiction, if she was going to deny a claim, if she needed case law, or if a question came up in the middle of her investigation. Id. ¶ 139. Blue generally drafted letters to outside counsel by herself, which may or may not be revised by her supervisor. Id. ¶ 140.

14. **Blue's Responsibility For Assigned Dedicated Accounts**

Blue was assigned certain insureds as dedicated accounts, which she was responsible for servicing from a customer service perspective. Pl's Resp. to Def's 56.1 Stmt. ¶ 141. Blue states that she shared her responsibility for servicing dedicated accounts with Shannon. Id. In her affidavit, Blue explains: "Shannon regularly involved herself in my relationships with my dedicated accounts. In many instances, she communicated with these insureds or directed me how to communicate with my contacts at the dedicated accounts." Blue Aff. ¶ 12. Blue admits that she established good working relationships with most of her contacts at her dedicated accounts. Pl's Resp. to Def's 56.1 Stmt. ¶ 143. Blue spoke with contacts at her dedicated accounts as often as needed. Id. ¶ 144. Blue testified that "Chubb insureds are high-maintenance customers, and they always think they're entitled to information whether that information exist[s] or not." Id. ¶ 145. Blue conducted claim reviews on certain of her dedicated accounts. Id. ¶ 146. In general, a claim review required the LTA to review the insured's claims, review the facts and answer questions the insured might have. Id. ¶ 147. Claim reviews were conducted in person at the insured or by telephone. Id.

**C.    Blue's Performance As An LTA**

In Blue's February 2001 performance review, Smurawski stated: "Shannon services accounts, not only by handling claims in the most efficient manner, but by responding to issues posed, providing expeditious resolution, providing status reports to customers and working as a liaison between insured and the underwriting department." Pl's Resp. to Def's 56.1 Stmt. ¶ 148. Blue testified that she agreed with this observation. Id. In this same review, Smurawski also stated that Blue "takes every opportunity to educate, update and communicate with insureds and claimants." Id. ¶ 149. Blue testified that she agreed with this observation. Id. In August 2002, Shannon

provided Blue with a performance review and rated Blue as "met most expectation." Id. ¶ 152. Blue was informed that she would not receive a pay raise for 2003. Id. ¶ 154. On or about May 15, 2003, Blue was placed on a performance improvement plan ("PIP"). Id. ¶ 169. As part of the PIP, Blue met with Shannon, Nelson, and a human resources representative on a weekly basis. Id. ¶ 171. On June 13, 2003, Blue received a Final Written Warning. Id. ¶ 173. Chubb terminated Blue's employment on July 9, 2003 for failing to meet the requirements of her PIP. Id. ¶ 174.

## DISCUSSION

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Id. at 256.

### A.    Blue's FLSA and IMWL Claims

Under the FLSA, employers must pay their employees at least one-and-one-half times their regular wages for any hours worked in excess of forty in a work week. 29 U.S.C. § 207(a)(1). However, employees "employed in a bona fide executive, administrative, or professional capacity" are exempt from this requirement. 29 U.S.C. § 213(a)(1). Chubb argues that Blue falls within the administrative exemption. "The FLSA does not define 'executive, administrative, or professional

-15-

capacity'; instead, it expressly delegates that task to the Secretary of Labor . . . ." <u>Kennedy v.</u>
<u>Commonwealth Edison Co.</u>, 2005 WL 1324835 at *3 (7th Cir. June 2, 2005). The Secretary of Labor
has defined a long test and a short test to determine whether an employee falls within the
administrative exemption. <u>Id.</u> at *4.[12] The parties agree that the short test applies here.

The employer bears the burden of demonstrating that an employee is exempt from the
FLSA's overtime requirements. <u>Kennedy</u>, 2005 WL 1324835, *4. To establish that an employee
falls within the administrative exemption under the old short test, the employer must demonstrate
that the employee meets three conditions. <u>Id.</u> (citing <u>Piscione v. Ernst & Young</u>, 171 F.3d 527, 533
(7th Cir. 1999)). First, an employee must be paid on a salary basis, as defined in the regulations. <u>Id.</u>
Second, the employee's primary duty must involve office or nonmanual work "directly related to
management policies or general business operations." Finally, the employee's work must "include
[] work requiring the exercise of discretion and independent judgment." <u>Id.</u> To prevail on its
summary judgment motion, Chubb must show that there is no genuine issue of material fact on each
one of these points. <u>Id.</u> No genuine issue of fact exists as to whether Blue meets the later two
conditions of the short test, but a genuine issue for trial remains as to the salary basis condition of
the short test.[13]

---

[12] The regulations governing exemptions from overtime for executive, administrative,
professional, computer and outside sales employees were revised effective August 23, 2004. <u>See</u> 29
C.F.R. Part 541. The parties agree that the old regulations govern this case. All citations are to the
old regulations.

[13] Because Chubb is not to summary judgment on the totality of Blue's FLSA claim, her
related state law claim survives summary judgment under the IMWL as well. <u>Kennedy</u>, 2005 WL
1324835 at *10 (stating 820 ILCS 105/4(a)(2)(E) makes "a violation of the IMWL contingent on
establishing a violation under the FLSA."). The same factual dispute precludes summary judgment
under the IMWL.

## 1.   **Salary Basis**

A factual dispute exists regarding whether Blue was paid on a salary basis. An employee is paid on a salary basis if "under his employment agreement he regularly receives each pay period . . . a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or the quantity of the work performed." 29 C.F.R. § 541.118(a). "If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis." Piscione, 171 F.3d at 534. The salary-basis test denies exempt status "when employees are covered by a policy that permits disciplinary or other deductions in pay 'as a practical matter'" Haywood v. North American Van Lines, Inc., 121 F.3d 1066, 1069 (7th Cir. 1997) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)). The salary basis test is not met "if there is an actual practice of such deductions *or* if there is an employment policy that creates a significant likelihood of such deductions," so long as the policy is "clear and particularized" so as to "'effectively communicate[]' that deductions will be made in specified circumstances." Id. (emphasis added); Auer v. Robbins, 519 U.S. at 461.

When Blue began working at Chubb, she earned a salary of $1918.17 twice a month. Pl's Resp. to Def's 56.1 Stmt. ¶ 22. At the time of her termination, Blue's salary was $2054.39 twice a month. Id. There is no evidence that Blue's regular bi-weekly salary was ever reduced during her employment with Chubb. In her Complaint, Blue alleged that Chubb treated her as non-exempt by "docking her paid time off for leaving work at any time prior to 2 p.m." Cmplt. ¶ 6. The factual record demonstrates otherwise. There is no dispute that Blue's regular bi-weekly compensation was never reduced as a result of an absence from work. Pl's Resp. to Def's 56.1 Stmt. ¶ 25.

-17-

Blue argues that the salary test is not met here because she "stood to have her final paycheck cut if her lost time for leaving early complete[ly] deleted her paid time off," but there is no evidence in the record supporting her assertion. Pl's Brief at 3. In order to survive summary judgment, Blue must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). She may not rely on allegations contained only in her brief and not supported by admissible evidence. The evidence indicates that Blue never had her salary reduced as a result of an absence from work.

Blue also argues that she was not paid on a salary basis because she was required to use her paid time off bank for partial day absences. According to Blue, "[t]he Seventh Circuit's standard on the issue of docketing pay makes no distinction between the weekly paycheck and pay for time off." Pl's Opp. at 2. Blue is incorrect. As the Seventh Circuit has explained, "[t]he regulations prohibit monetary discipline of exempt employees." Haywood, 121 F.3d at 1070. "Nothing in the regulations suggests that an employee loses his exempt status simply because his employer disciplines him in a non-monetary fashion for failing to work his scheduled time." Id. In Kennedy, the Seventh Circuit held that an employer who reduced the employee's number of personal days by one if an employee failed to make it to work during a snowstorm, but did not reduce the employee's salary, satisfied the salary test. Kennedy, 2005 WL 132485 at * 5 (holding "[t]he FLSA does not prohibit this type of non-monetary deduction."); see also Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir. 2004) (holding "[e]xempt status . . . is only affected by monetary deductions for work absences and not by non-monetary deductions from fringe benefits such as personal or sick time); Webster v. Public School Employees of Washington, Inc., 247 F.3d 910, 917 (9th Cir. 2001) (stating "leave time is not salary" and holding that deductions from sick leave or

vacation allowance in fifteen-minute increments for partial day absences does not defeat employee's exempt status, even though accumulated leave is convertible to cash). Finally, the Department of Labor has repeatedly opined that deductions from leave time for partial-day absences does not render an employee non-exempt as long as the employee receives his guaranteed salary. See DOL Opinion Letter, 2005 WL 330606 (Jan. 7, 2005); DOL Opinion Letter, 2001 WL 1558766 (Feb. 16, 2001); DOL Opinion Letter, 1999 WL 1002408 (May 27, 1999); DOL Opinion Letter, 1997 WL 970567 (July 23, 1997); DOL Opinion Letter, 1992 WL 845093 (April 14, 1992). These opinions are entitled to "considerable weight." Cvelbar v. CBI Ill., Inc., 106 F.3d 1368, 1376 (7th Cir. 1997), *abrogated on different grounds by* International Union of Operating Engineers, Local 150, AFL-CIO, 161 F.3d 427 (7th Cir. 1998).

Although not mentioned in her brief, there is a factual assertion contained in Blue's affidavit which creates an issue for trial regarding whether she was paid on a salary basis for purposes of the FLSA. In paragraph 7 of her affidavit, Blue states that she was told by her supervisors, Smurawski and Shannon, prior to Thanksgiving 2000 and in May 2003, respectively, that if she left work prior to 2:00 p.m., she would be docketed a half day's pay. Pl's 56.1 Stmt. ¶ 13(b). Chubb disputes Blue's factual assertion and cites Shannon's deposition testimony. Shannon testified: "The department rule is that if you leave before 2:00 p.m., that you are charged with a half PTO day." Shannon Dep. at 207. Although Blue never suffered an actual deduction, her affidavit raises a genuine issue of fact that would allow a jury to infer that Chubb had in place an employment policy that creates a significant likelihood of deductions from pay in the event of an absence from work prior to 2:00 p.m. See Haywood, 121 F.3d at 1071 (holding that employee's allegation that she was "threatened with a pay reduction if she did not make up the time she was going to take off" might

preclude summary judgment if the allegation was supported by the record). The Court therefore denies summary judgment on the issue of whether Blue was paid on a salary basis for purposes of the FLSA.

**2.  Primary Duty**

Next, Chubb must show that Blue's duties "consisted primarily of office or nonmanual work directly related to management policies or general business operations." Haywood, 121 F.2d at 1071. Work "directly related to management policies or general business operations" includes activities "relating to the administrative operations of a business as distinguished from 'production' . . . work." 29 C.F.R. § 514.205(a). "The typical example of the production/administrative dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." Kennedy, 2005 WL 1324835, at *6 (quoting Shaw v. Prentice Hall Computer Pub., Inc., 151 F.3d 640, 644 (7th Cir. 1998)). Administrative duties include "'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. §541.205(b).

The undisputed facts demonstrate that Blue performed administrative tasks directly related to Chubb's management policies or general business operations.[14]  There is no dispute that Blue performed office work in Chubb's offices in the Sears Tower. Pl's Resp. to Def's 56.1 Stmt. ¶ 22. Piscione, 171 F.3d at 538 (stating "we must first ascertain whether the employee's work is office or nonmanual work."). Moreover, claims adjusters like Blue typically perform administrative duties.

---

[14] Blue has effectively conceded this point by failing to argue in her brief that there are issues of fact as to this prong of the short test.

29 C.F.R. § 541.205(c)(5) (stating "the test of 'directly related to management policies or general business operation' is also met by many persons employed as . . . claims agents and adjusters . . . ."); Jastremski v. Safeco Ins. Co., 243 F.Supp.2d 743, 751-53 (N.D. Ohio. 2003); Palacio v. Progressive Ins. Co., 244 F.Supp.2d 1040, 1046-47 (C.D. Cal. 2002); see also Haywood, 121 F.3d at 1072 (stating that "claims agents and adjusters . . . are specifically mentioned by the regulations as meeting the 'directly related' test.") and DOL Opinion Letter, 2002 WL 32406601 (November 19, 2002) (stating "Wage and Hour has long recognized that claims adjusters typically perform work that is administrative in nature.").

On similar facts, courts have held that claims adjusters perform administrative, not production, duties. See Jastremski, 243 F.Supp.2d at 753; Palacio, 244 F.Supp. 2d at 1047. Like the plaintiffs in Jastremski and Palacio, Blue planned how to handle her assigned claims, advised management regarding her claims handling and related matters, had the authority to settle claims within the limits provided to her, and represented Chubb during negotiations with attorneys and claimants. And, like the defendant insurance companies in those cases, Chubb is in the business of writing and selling insurance policies, has multiple departments which service that business, including the claims handling department, and never receives claims from the vast majority of workers covered by a Chubb workers' compensation insurance policy. Pl's Resp. to Def's 56.1 Stmt. ¶¶ 8, 9, and 13.[15]

---

[15] Blue objects to Chubb's reliance on Nelson's declaration as support for paragraph 13 of its 56.1 Statement because the declaration contains "no recital that Nelson is competent to testify about the facts adduced therein." Pl's Resp. to Def's 56.1 Stmt. at 1. Blue also objects to paragraph 9 of Nelson's declaration because it lacks the requisite foundation. The Court rejects these challenges. Rule 56(e) states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Unsworn

In order to be directly related to management policies or general business operations, the work performed must also be "of substantial importance to the management or operation of the business of his employer or his employer's customers." 29 C.F.R. § 541.205(a). "[M]ost courts have agreed that insurance adjusters . . . do work that is 'of substantial importance to [the employer's] business operations and management policies.'" <u>Robinson-Smith v. Government Employees Ins. Co.</u>, 323 F.Supp.2d 12, 22 (D. D.C. 2004). The same conclusion is warranted here. It is undisputed that Blue handled 150-165 claims at a time, valued between approximately $4,000,000 and $4,500,000 in the aggregate. Pl's Resp. to Def's Rule 56.1. Stmt. ¶¶ 28, 29. <u>Haywood</u>, 121 F.3d at 1072; <u>In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation</u>, 336 F.Supp.2d 1077, 1103 (D. Or. 2004) (holding that claims representatives who handle $1 million or more in claims per year perform work that is of substantial performance). Moreover, Blue was responsible for planning and carrying out the investigation of her assigned claims, determining coverage, watching for fraud indicators, analyzing information, and drawing conclusions about the appropriate reserve and/or settlement amounts. Blue was also responsible for engaging in settlement negotiations on behalf of Chubb. Blue conceded that her determinations could have financial consequences for Chubb. Pl's Resp. to Def's 56.1 Stmt. ¶¶ 50, 59.

---

declarations are also permitted. <u>See</u> 28 U.S.C. § 1746. Rule 602 of the Federal Rules of Evidence also provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Nelson's declaration complies with the requirement under 28 U.S.C. § 1746 that it be made under penalty of perjury. The court is also satisfied that Nelson's declaration has adequate foundation for paragraph 9. Based on Nelson's experience as Northern Zone Workers' Compensation Manager and Midwest Workers' Compensation Manager for Chubb, the Court can reasonably infer that she has sufficient personal knowledge to testify that "Chubb never receives claims from the vast majority of workers covered by a Chubb workers' compensation insurance policy." The declaration need not contain an express recital stating that Nelson is competent to testify about the facts contained therein.

The Department of Labor has confirmed that claims adjusters perform work of substantial importance. In its opinion letter of November 19, 2002, the DOL found that adjusters who had full and final authority to settle claims within their established settlement authority performed work of substantial importance to the management or operation of their employer:

> [T]heir determinations regarding whether a particular incident is covered by a policy, and their determinations regarding liability and what the damages are, can result in extremely large financial consequences for the firm. Those steps are essential aspects of every claim processed, and they must be done correctly in order to assure that the insurance company pays what it is contractually obligated to pay, whether to a policyholder or a third party claimant. The claims adjuster also is responsible for setting the level of reserves for each claim, which is required for compliance with state law. I[f] an audit reveals that adequate reserves have not been established, the state insurance commissioner may sanction the company. These responsibilities clearly are of substantial importance to the management or operation of the insurance company.

DOL Opinion Letter, 2002 WL 32406601 (November 19, 2002). The Court concludes that there is no genuine dispute that Blue performed work of substantial importance to Chubb.

### 3. Exercise of Discretion and Independent Judgment

Under the third prong of the short test, Chubb must demonstrate that there is no material issue of fact concerning whether Blue's duties "include[d] work requiring the exercise of discretion and independent judgment." 29 C.F.R. 514.214; Kennedy, 2005 WL 1324835 at *4; Piscione, 171 F.3d at 533. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). The term discretion and independent judgment "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Id. However, it "does not necessarily imply that the decisions made by the employee must have a

-23-

finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. 541.207(e)(1).

"A number of courts have found that claims agents and adjusters may exercise sufficient discretion and independent judgment to satisfy the administrative exemption." Robinson-Smith, 323 F.Supp. at 23-24 (citing Jastremski, 243 F.Supp.2d at 757; Palacio, 244 F.Supp.2d at 1048; and Munizza v. State Farm Mutual Automobile Ins. Co., 1995 U.S. Dist. LEXIS 22362 (W.D. Wash. 1995)). The record here compels the same conclusion. There is no genuine issue of fact as to whether Blue's duties included the exercise of discretion and independent judgment.

As an LTA, Blue investigated, evaluated, and resolved workers' compensation claims. She was responsible for handling 150-165 workers' compensation claims at a time. Investigating, evaluating, and resolving claims requires the exercise of discretion and independent judgment. Blue decided what actions were necessary based on the unique facts of each individual claim. Blue was given some latitude to conduct investigations and resolve her assigned claims. Blue was not merely applying her knowledge to prescribed procedures or determining which procedure to follow, or determining whether specific standards were met or whether an object falls into one or another of a number of definite grades, classes, or other categories. 29 C.F.R. 541.207(c)(1). Rather, she evaluated claims and decided the proper course of action. The undisputed facts demonstrate that Blue evaluated alternative courses of conduct and had the authority to make some independent choices free from immediate direction or supervision, with respect to matters of significance and consequence. 29 C.F.R. § 541.207(a), (d)(1).

Specifically, Blue was responsible for negotiating settlements of her assigned claims. This task required discretion and independent judgment. Haywood, 121 F.3d at 1073 (holding that employee who was given "some latitude" in negotiating and settling claims exercised discretion and independent judgment); Palacio, 244 F.Supp.2d at 1048 (stating "[n]egotiations demand more than the bare application of learned skills in conformance with prescribed procedures."). With respect to negotiating settlements, it is undisputed that Blue considered herself a good negotiator, that she was responsible for making the first settlement offer, she had absolute authority to settle claims within her given authority, she used specific techniques for negotiating claims, she had responsibility for negotiating settlements with claimants or their attorneys, and she never had a supervisor take over settlement negotiations. Pl's Resp. to Def's 56.1 Stmt. ¶¶ 112, 118, 119, 120, 122, and 123.

In addition to settlement negotiations, Blue "exercise[d] discretion and independent judgment in the management of claims and [in] her dealings with claimants." Palacio, 244 F.Supp.2d at 1048-49. Blue was responsible for investigating claims, each of which presented different factual and medical issues. Pls' Resp. to Def's 56.1 Stmt. ¶¶ 31-41, 43-47. Blue's LTA duties included making recommendations on compensability, determining whether a claim was covered by the applicable policy, making recommendations to her supervisor to deny coverage, identifying fraud or potential fraud, performing disability management, sometimes deciding whether to order an IME, reviewing the IME report or the nurse's note regarding it to determine whether it affected the action plan for the claim, recommending a reserve number to her supervisor, performing litigation management of her claims assigned to outside counsel, and servicing her dedicated accounts. Id. ¶¶ 48-55, 57, 61, 92-95, 97-99, 126-29, 131-32; 141-45, 148; Pl's Dep. at 118-19, 121-22. Blue exercised discretion and used her own judgment in making these decisions. For example, deciding whether a claim is

covered by the applicable policy required Blue to determine whether an employment relationship existed between the claimant and the insured. Pl's Resp. to Def's 56.1 Stmt. ¶ 58. When Blue made a recommendation that a claim was not covered, she was required to provide an explanation for her recommendation. Id. ¶ 62. In setting a reserve number, Blue considered, among other things, the type of illness, the age of the claimant, the claimant's prior medical history, prior worker's compensation history, prior work history, and the type of job the claimant was working on when he got hurt. Id. ¶¶ 92, 93, 98, 99. Chubb expected Blue to thoroughly outline her rational or basis for a reserve recommendation. Id. ¶ 94. These undisputed facts demonstrate that Blue's duties as an LTA included the exercise of discretion and independent judgment. See DOL Opinion Letter, 2002 WL 32406601 (November 19, 2002) (finding exempt adjusters who used "their own judgment about what the facts show, who is liable, what a claim is worth, and how to handle the negotiations with either a policyholder or a third-party claimant in order to achieve a successful resolution.").

Blue's brief and affidavit submitted in opposition to summary judgment attempt to portray her LTA duties as involving nothing more than carrying out the instructions and directions of her supervisor. Blue's affidavit states that Shannon "shared many of my job responsibilities with me" as opposed to Blue having exclusive responsibility. Pl's Aff. ¶ 11; Pl's Dep. at 321. Blue's affidavit goes on to state that Shannon "regularly" did Blue's work, told Blue how to do her work, and dictated what words Blue should use when communicating with others. Blue's Aff. ¶ 11. Blue's affidavit states that Shannon accessed Blue's claim files on a daily basis and "regularly" directed her on when and how to proceed. Id. at ¶¶ 11, 15. Blue also states in her affidavit that Shannon "regularly" involved herself in Blue's relationships with her dedicated accounts by directly communicating with these insureds or directing Blue on how to communicate with her contacts at

the dedicated accounts. Id. ¶ 12. Shannon also required Blue to respond to her communications

regarding claims within 24 hours. Def's Resp. to Pl's 56.1 Stmt. ¶¶ 28, 61, 62.

Under the short test, Blue's affidavit does not create a dispute of fact that requires resolution

at trial.[16] The regulations do not require that Blue constantly or even regularly exercise discretion

and independent judgment to satisfy the short test for the administrative exemption.[17] Blue's work

---

[16] Blue also relies on the affidavits of two other claims adjusters (Lisa Contro and Shannon Kneeland) who claim that Shannon "closely supervised" and "micromanaged" their work. Pl's Brief at 6. Contro's and Kneeland's affidavits do not create a genuine dispute regarding whether Blue's duties included the exercise of discretion and independent judgment. The relevant inquiry is whether Blue satisfied the administrative exemption, not whether her co-workers did. This entails a very fact specific inquiry regarding Blue's job responsibilities. "[T]he exempt or non-exempt status of any particular employee must be determined on the basis of whether *his* duties, responsibilities, and salary meet all the requirements of the appropriate section of the regulations . . . ." 29 C.F.R. § 541.201(b)(2) (emphasis added). Blue's own testimony reveals that her duties included the exercise of discretion and independent judgment. It is immaterial whether Contro and Kneeland exercised discretion and independent judgment under Shannon.

[17] The long test requires that discretion and independent judgment be exercised "customarily and regularly." Under the more lenient standard of the short test, an employee's duties need only "include" work requiring the exercise of discretion and independent judgment to qualify as an exempt employee. See Hogan v. Allstate Ins. Co., 361 F.3d 621, 627 n.6 (11th Cir. 2004); McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1002 and n.3 (8th Cir. 2003); Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 901 n.4 (3d Cir. 1991); Donovan v. Tama Meat Packing Corp, 817 F.2d 54, 55 (8th Cir. 1987); Clark v. J.M. Benson Co., Inc., 789 F.2d 282, 287 (4th Cir. 1986); Donovan v. United Video, Inc., 725 F.2d 577, 581 n.4 (10th Cir. 1984); Dymond v. United States Postal Service, 670 F.2d 93, 95 (8th Cir. 1982). Without expressly discussing the issue, the Seventh Circuit has applied the "include" standard under the short test. Kennedy, 2005 WL 1324835 (7th Cir. 2005); Piscione, 171 F.3d at 533. The Court notes that the Fifth and Sixth Circuits have held that the short test requires employees to "customarily and regularly" exercise discretion and independent judgment. See Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 519 (6th Cir. 2004); Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 403-04 (6th Cir. 2004); Heidtman v. County of El Paso, 171 F.3d 1038, 1042 (5th Cir. 1999); Douglas v. Argo-Tech Corp, 113 F.3d 67, 72 (6th Cir. 1997). A conflict exists in the Ninth Circuit regarding this issue. Compare Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1129 (9th Cir. 2002) (ordering district court on remand to consider under the short test whether plaintiff "customarily and regularly exercised discretion and independent judgment.") with O'Dell v. Alyeska Pipeline Service Co., 856 F.2d 1452, 1453-54 (9th Cir. 1988) (holding "[u]nder the Short Test, O'Dell's job must only '*include* [] work requiring the exercise of discretion and independent judgment' to qualify him as an exempt employee under the

-27-

need only "include" the exercise of discretion and independent judgment. 29 C.F.R. §§ 541.2(e)(2), 541.214(a). Employees "qualify for the administrative employee exemption if they meet the more liberal standard requiring that their duties merely 'include' work requiring the exercise of discretion and independent judgment." Dymond, 670 F.2d at 95. Blue's deposition testimony demonstrates that her work included the exercise of discretion and independent judgment.

Moreover, nothing in the administrative exemption regulations requires that an employee have exclusive responsibility for all assigned tasks or perform tasks without supervisor input or oversight. See 29 C.F.R. §§ 541.2 and 541.201 et. seq. Blue's attempt to minimize the discretion and independent judgment she exercised as a LTA by asserting that she "shared many" responsibilities with her supervisor does not defeat her exempt status where it is undisputed that Blue's work "included" the exercise of discretion and independent judgment. Even if this practice of "shar[ing] many" responsibilities with Shannon reduced some of Blue's discretion and independent judgment, Blue has not demonstrated that it eliminated her discretion and use of independent judgment.

Similarly, the fact that Blue's work consisted of recommendations to her supervisor also does not mean that her work did not include the exercise of discretion and independent judgment. See Pl's Dep. at 122; In re Farmers, 336 F.Supp.2d at 1103 (holding that the fact that liability claims adjusters "may make recommendations for action rather than taking action, or that their decisions may be subject to review does not affect the analysis."). The exercise of discretion and independent judgment does not require that an employee make final decisions that are not subject to higher

administrative exemption."). Because the "customarily and regularly" language only appears in the long test for the administrative exemption, this Court applies the more lenient "include" standard under the short test.

approval or review. See 29 C.F.R. § 541.207(e). Even though an employee's work is subject to

review or even reversal does not mean necessarily that the employee will outside the FLSA's

administrative exemption. Kennedy, 2005 WL 1324835, at *8; Haywood, 121 F.3d at 1073 (stating

the fact that the employee had supervisors "who reviewed her work does not defeat her exempt status

under the FLSA."). "While the regulations require the employee to exercise independent judgment,

the term does not require this judgment to be made in isolation." Piscione, 171 F.3d at 535. Finally,

"[t]he fact that a chosen action might be overruled by a supervisor says nothing about the discretion

and judgment that went into its selection in the first place." Kennedy, 2005 WL 1324835, at *9.

Blue argues that the amount of direction and supervision that she received from Shannon was

so close that she was not able to use sufficient discretion and independent judgment in the

performance of her duties as an LTA. Blue states that her work was supervised on a daily basis and

that Shannon "micromanaged" her work, especially through "supervisor's notes" transmitted through

Task Assistant. See Pl's Exh. F. Blue states that Shannon sent such communications several times

a week. Pl's Aff. ¶ 22. Although the record reveals occasions when Blue received direction from

Shannon on how to performed her work, the undisputed record shows that Blue used her own

discretion and independent judgment to perform many of the functions of her job.

Shannon's use of Chubb's Best Practices and Task Assistant is also insufficient to deprive

Blue of administrative exempt status. Under Best Practices, supervisors were expected to take an

active role in the processing of claims to ensure that Chubb employees in the workers' compensation

department were exhibiting behaviors that achieved the best claims result. Def's Resp. to Pl's 56.1

Stmt. ¶ 2. Chubb's workers' compensation claims files are stored and accessed through a program

called Claims Vision. Id. ¶ 3. Task Assistant is a file management system that is integrated with

Claims Vision. Id. Task Assistant enabled Shannon to access the files being handled by her subordinates, to send them supervisor's notes, and to observe if each adjuster was maintaining the department standard of 20 tasks per day. Id. ¶ 4. Blue has not demonstrated that Best Practices and Task Assistant prohibited or replaced her exercise of discretion and independent judgment in the handling of her assigned claims. In fact, Blue testified that Best Practices did not effect Blue's analysis of her assigned claims. Blue Dep. at 267-69. The fact that Task Assistant may have increased the level of supervision Blue received does not establish that Blue did not actually exercise discretion and independent judgment in evaluating each unique claim. It is uncontroverted that Blue exercised discretion and independent judgment in the performance of some of her duties, despite the software programs.

Finally, the cases cited by Blue are easily distinguishable because they involved insurance adjusters who handled vehicle damage claims. See Robinson-Smith, 323 F.Supp.2d at 26 (holding "GEICO auto damage adjusters do not exercise sufficient discretion and independent judgment to qualify for the administrative exemption and are thus entitled to overtime pay."); In re Farmers, 336 F.Supp. 2d at 1103. The In re Farmers case, cited by Blue, distinguished auto physical damage claims representatives who handled physical damage claims to vehicles from liability claims representatives who were "responsible for handling bodily and personal injury and death claims." The court held that auto physical damage claims representatives did not meet the discretion and independent judgment prong and explained:

> Certainly [auto physical damage ("APD") claims representatives ("CR") use some discretion in adjusting physical damage claims, but the evidence established that an APD CR's primary duties require the use of skill in applying techniques, procedures and specific standards, not the use of discretion and independent judgment in matters of consequence. Significantly, in most cases, a vehicle's VIN number tells the CR

> almost everything there is to know about the vehicle involved. Vehicle damage is finite and limited to the value of a known entity from standard sources. Certainly, an APD must make choices among options in adjusting a claim, but with the advent of [the Customer Restoration Network] and the use of CCC [software], the choices are limited and do not involve "matters of significance."

In re Farmers, 336 F.Supp.2d at 1103. On the other hand, the In re Farmers court held "[w]ithout hesitation," that claims representatives handling bodily and personal injury and death claims "exercise considerable independent judgment and discretion on matters of substantial importance." Id. Blue has not cited any federal case holding that a claims adjuster handling bodily injury claims, such as workers' compensation claims, does not exercise the requisite discretion and independent judgment.

For these reasons, Chubb is entitled to summary judgment on the third prong of the administrative exemption short test.

## B.    Blue's IWPCA Claim

Blue also brings a claim under the IWPCA based on Chubb's failure to "compensate Plaintiff for all hours she has worked for Defendant." Cmplt. ¶ 23. Blue alleges that Chubb failed to pay her for "all paid time off" and "all hours worked in individual work weeks." Id.

The IWPCA requires that every employer shall pay the final compensation due to a separated employee at the time of separation, if possible, but in no case later than the next regularly scheduled payday for that employee. 820 ILCS 115/5. In addition, if a contract of employment or employment policy provides for paid vacations and an employee is separated from employment without having taken all vacation time earned, the monetary equivalent of all earned vacation shall be paid to the employee as part of his or her final compensation. Id. The IWPCA defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned

vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties. 820 ILCS 115/2. The IWPCA also defines wages as "any compensation owed an employer pursuant to an employment contract or agreement between the parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." Id. "The IWPCA, then, merely requires 'that the employer honor his contract'; it does not confer rights to compensation in the absence of a contract." In re Comdisco, Inc., 2003 WL 685645 at *3 (N.D. Ill. Feb. 27, 2003) (quoting Nat'l Metalcrafters v. McNeil, 784 F.2d 817, 824 (7th Cir. 1986)); see also Stark III v. PPM America, Inc., 354 F.3d 666, 672 (7th Cir. 2004) (holding "the IWPCA requires a right to compensation pursuant to an employment contract or agreement.").

Chubb is entitled to summary judgment on Blue's IWPCA claim. Blue admitted that she did not have an agreement with anyone at Chubb that she would be paid overtime if she worked more than 40 hours per week. Blue's Dep. at 149. Blue has also failed to present any evidence supporting her allegation that Chubb failed to pay her for all her paid time off. The fact that a genuine dispute for trial exists as to whether Blue was properly classified as exempt under the FLSA and IMWL does not preclude summary judgment on her IWPCA claim where there is no evidence that Chubb breached an agreement or contract promising to pay overtime. "The plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations." Palmer v. Great Dane Trailers, 2005 WL 152855, *3 (N.D. Ill. June 28, 2005) (dismissing IWPCA claim based on failure to pay overtime where employee had not alleged the existence of any agreement, contract, or CBA stating that the employer promised to pay employee overtime). The proper avenue for seeking unpaid overtime when not covered by an agreement or

contract is through the FLSA and IMWL, not the IWPCA. Id. Chubb is entitled to summary judgment on Count III.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in part and denied in part as to Counts I and II and granted as to Count III. This case is set for a status hearing on July 27, 2005 at 9:00 a.m.

**E N T E R:**

*Nan R. Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:  July 13, 2005**